CONSEQUA *against* FANNING and others.

On a re-hearing, the cause is open to the party who petitions for the re-hearing, only as to those parts of the decree complained of in the petition; but as to the other party, the cause is open as to the whole matter.

An order of reference, for account, before a Master, cannot be more extensive, than the allegations and proofs of the parties.

Where the charges in the bill are specific, setting forth the *items* of the account, with their dates, on an order of reference for an account, the inquiry is not open beyond the special matters charged; although the bill may contain a general charge at the conclusion, and a prayer for " a full account concerning the premises."

In all questions arising between the subjects of different states, each is to be considered as a party to the laws and authoritative acts of his own government.

If a merchant abroad sends goods to a merchant here, by his order, or by that of his agent, which are received with the invoice, and accepted, without any objection at the time, he cannot, afterwards, object that the articles were overcharged in price.

Where a consignee of goods sells some of them on credit, and settles with his consignor, and pays him the full amount, he cannot, afterwards, claim to be reimbursed for any part, on the ground of a bad debt made in the sale; there being no fraud or mistake in the settlement.

Unsettled accounts do no bear *interest.*

Where a balance of an account is paid without any charge of interest, it cannot, afterwards, be demanded.

*Interest* is payable according to the laws of the country where the debt is contracted and to be paid.

Where a *Chinese* merchant consigns goods to a merchant in *New-York*, for sale, which are delivered at *Canton*, to the agent of the *New-York* merchant, who neglects to remit the proceeds to the consignor, the latter is entitled to interest on the amount, according to the law and custom of *China*, being *twelve* per cent.

PETITION for a *re-hearing.* The bill stated, that the plaintiff, a native merchant of *Canton*, in *China*, on the 22d of *December*, 1807, shipped on board the *John and James*, at *Canton*, a cargo of teas, valued at 19,837 dollars and 77 cents, and consigned the same to the defendants, *Edmund Fanning, Henry Fanning*, and *Willet Coles*, being partners in trade, owners of vessels, and factors and commission merchants, to sell for the plaintiff, and which were received by the defendants, as his factors. That, on the 24th of *December*, 1807, the plaintiff shipped on board the

*September 29th, and 30th, and November 26th.*

*Hope* and *Atahualpa*, teas and nankeens, to the value of 29,135 dollars and 63 cents, and consigned the same to the defendants, for sale, and who received the same as his factors. That the defendants, by their authorized agent, *Obed Chase*, on the 19th of *January*, 1811, gave the plaintiff a promissory note, dated at *Canton*, for 35,717 dollars and 50 cents, payable sixteen months after date, with interest at *twelve* per cent., which is the lawful and customary rate of interest at *Canton*, which note is still unpaid, and was given for the goods sold and delivered to the defendants. That, in *December*, 1809, *John Smith Crary* and *William E. Nexsen*, as lawful attorneys and agents of the defendants, gave, at *Canton*, a promissory note to the plaintiff, for 39,690 dollars and 63 cents, payable fifteen months after date, with interest, after the same should become due, at twelve per cent.; which note was unpaid, and seven months interest due thereon, when the said *Crary*, as agent of the defendants, gave the plaintiff a note for the interest then due, being 2,910 dollars and 64 cents, payable in twelve months, with interest at twelve per cent., which note is wholly due and unpaid. That, on the 25th of *November*, 1810, the plaintiff shipped on board the *Chinese*, teas and cassia, to the value of 64,828 dollars and 65 cents, consigned to the defendants, to be sold, and the proceeds remitted to the plaintiff, and which goods were received by the defendants, as the factors of the plaintiff, and sold. That, on the 29th of *November*, 1810, the plaintiff shipped on board the *Hope*, teas and nankeens, to the value of 6,370 dollars and 21 cents, consigned to the defendants, to sell, and remit the proceeds, and which were received and sold by the defendants. That by an agreement between the plaintiff and the defendants, in relation to their receiving and selling the goods, so consigned to them as factors, they were to sell the same with all reasonable expedition, and for the best prices, and for a reasonable reward to be retained, and to remit the pro-

ceeds, in specie, to *Canton ;* and for any unreasonable delay the defendants were to pay twelve per cent. interest, from the time such sales and remittances could reasonably have been made, that being the rate of interest where the plaintiff resided, and where the contract was to be fulfilled by the remittances. The plaintiff charged, that the defendants received all the goods so shipped, and sold them, and received the proceeds, and have retained, or wasted them, or lost part by their negligence, and have refused to render an account thereof, and remit the proceeds : That it was the agreement, or course of dealing, between the plaintiff and the defendants, that for all moneys due to him from them, they should pay to him twelve per cent. interest from the time of their default. That, on the 6th of *February,* 1806, *Acors Sheffield,* at *Canton,* gave the plaintiff a note for 4,080 dollars and 81 cents, payable in fifteen months, with interest, afterwards, at twelve per cent. ; and which note not being paid, the plaintiff, afterwards, on the 12th of *November,* 1807, delivered it to the defendant *E. F.* for collection, and to account to the plaintiff for the same ; that *E. F.* received the note, in behalf of the defendants, to collect, and has never accounted to the plaintiff for it, and they have either collected the money, or lost it by their gross negligence, and have refused to account for it, with the interest. That the defendants, between 1805 and this time, became indebted to the plaintiff, in various other large sums of money, amounting to 160,000 dollars, for teas and other goods, sold and delivered to them by the plaintiff; and for teas and other goods, consigned, &c. &c. Prayer, that the defendants be decreed to come to a full account with the plaintiff, concerning the premises, and to pay to him what shall be found due, &c.

The defendants, in their answer, denied that they were, at the times mentioned in the bill, general partners in trade ; but admitted that they were jointly concerned in

shipping, importing, and selling on commission, divers cargoes of merchandise, &c. They stated various matters in defence, and various counter claims, by way of deduction and set-off, which it is unnecessary to detail; the material facts will sufficiently appear from the decretal order and opinion of the court.

*Decretal Order.* The cause having been brought to a hearing, on the pleadings and proofs, the court, on the 30th of *September*, 1817, made the following decretal order: That it be referred to a Master to take an account between the plaintiff and defendants, touching the matters in the pleadings mentioned; and that, in taking such account, the Master charge the defendants with the goods in the pleadings mentioned, shipped by the plaintiff, on the 22d of *December*, 1807, in the ship *John and James*, amounting, according to the invoice, to 19,837 dollars 77 cents, consigned by the plaintiff to the defendants, and by them received to sell and dispose of for the plaintiff; *and, also,* charge the defendants with the goods, in the pleadings mentioned, shipped by the plaintiff, on the 24th of *December*, 1807, in the ship *Hope,* and in the ship *Atahualpa*, amounting, according to the invoice price, to 29,135 dollars and 63 cents, as for goods *consigned* by the plaintiff to the defendants to sell for the plaintiff; *and, also,* charge the defendants with 35,711 dollars and 50 cents, upon the foot of a promissory *note*, in the pleadings mentioned, dated the 19th of *January*, 1811, given to the plaintiff by *Obed Chase*, as the authorized agent of the defendants, payable sixteen months after date; *or,* if the Master should be of opinion that *Obed Chase* was not duly authorized to give it, that, then, the Master charge the defendants with that sum, as for goods sold and delivered by the plaintiff to the defendants, on the 19th of *January*, 1811, at a credit of sixteen months; *and, also,* charge the defendants with 36,690 dollars 63 cents, upon the foot of a promissory

note, in the pleadings mentioned, given the 9th of *Decem-* 1818.
*ber,* 1809, to the plaintiff, by *John Smith Crary* and *Wil-*
*liam E. Nexsen,* as the authorized agents of the defendants, COSNEQUA
payable fifteen months after date; *and, also,* charge the FANNING.
defendants with only so much of the goods in the plead-
ings mentioned, and shipped by the plaintiff, on the 25th
of *November,* 1810, in the ship *Chinese,* amounting to
64,828 dollars and 65 cents, according to the invoice
price, after deducting 43,025 dollars and 87 cents, being
so much of the shipment as the plaintiff appears to have
assigned to *William Baring* and others, in the pleadings
mentioned, and that the sum of 21,798 dollars 78 cents,
being the residue of the last shipment, after deducting the
assignment to *Baring & Co.,* be charged as for goods *con-*
*signed* by the plaintiff to the defendants, and by them re-
ceived to sell for the plaintiff; *and, also,* charge the de-
fendants with the goods, in the pleadings mentioned,
shipped by the plaintiff, the 29th of *November,* 1810, in
the ship *Hope,* amounting, according to the invoice price,
to 6,370 dollars 21 cents, as for goods *consigned* by the
plaintiff to the defendants, and by them received, to sell
for the plaintiff; *and, also,* charge the defendants with
*interest,* at the rate of *twelve* per cent., upon all the items
before mentioned, from such times as the said sums ought
to have been paid, that is to say, in case of goods sold,
from the expiration of the term of credit; and in case of
goods consigned, from the times the proceeds ought to have
been remitted, having regard to the course of such deal-
ings; and in case of promissory *notes,* from the time of
payment therein specified. *And, also,* charge the defend-
ants with 900 dollars, being so much of the amount of the
promissory note, in the pleadings mentioned, given by
*Acors Sheffield* to the plaintiff, and by him placed in the
hands of the defendants to collect, as was received by the
defendants; *and, also,* such farther sum, as it shall satis-
factorily appear to the Master, the defendants might have

**1818.**

**CONSEQUA**
**v.**
**FANNING.**

received, if they had used due diligence in collecting it, with lawful interest, from the time the same was received, or might have been received, as aforesaid. *And that* the plaintiff be allowed, in such account, all such further sums as shall appear that the defendants ought to account for and pay, by reason of any dealings and matters in the bill mentioned, with such *interest,* as the nature of the case, and the course of the dealings between the parties, shall render just. *And that* the Master make all proper allowances to the defendants for all *remittances and payments* made by them to the plaintiff, or to others for his use, and by his authority; *and that* the Master be at liberty to examine the parties, under oath, on interrogatories, and such other witnesses, not already examined, as either party may produce.

*Master's Report.* The *Master* made a report, on the 31st of *January,* 1818, in which he stated the gross amount of the sales of the cargoes mentioned in the decretal order, and the charges thereon, and the nett proceeds thereof, and the amount due from the defendants to the plaintiff; and that he had *charged* the defendants with the nett proceeds of the different consignments particularly mentioned in the decree, and with the goods sold, and with the amount of the notes; and that he had charged *twelve* per cent. interest on the items, except the last, in which the remittance was made in due time; and that he had *credited* the defendants for all remittances and payments by them on account of the said consignments and sales, and with all just allowances, and had calculated interest at *twelve* per cent. on the credits; leaving a *balance* due to the plaintiff, for principal and interest, to the date of the report, of 104,457 dollars and 91 cents.

*Objections.* The petition for a rehearing stated the following objections to the decretal order: 1. Because it does not direct a *general account* to be taken between the parties:

2. Because the decretal order limits, and circumscribes

the charges to be made by the defendants against the plaintiff, to *remittances* and *payments* by them to the plaintiff, and to others, for his use, and by his authority; and the Master has decided, and the defendants cannot be allowed for any charge or matter of account, unless it be shown to be a remittance or payment, specially and specifically applied to one or other of the matters with which the defendants are charged and made accountable by the decree; by reason whereof, matters of account to a very large amount, and, as the defendants believe, to a sum not less than 86,000 dollars, are wholly excluded from the said account; and the defendants are barred from the benefit thereof:

3. Because, the defendants are charged with a promissory note given by *Obed Chase* to the plaintiff, for 35,711 dollars and 50 cents, or with *goods sold and delivered* to the defendant, to that amount, which, by the terms of the decree, as it relates to the defendants, is substantially the same thing; whereas, by the pleadings and proofs, the defendants are not justly liable to be charged with the same in either shape; but only as for goods *consigned* to the defendants, by the plaintiff, to be sold for his account, and in this way they are willing to account.

4. Because, the defendants are charged with *interest* at *twelve* per cent. per annum, upon the items in the decree mentioned, or notes, or goods sold by the plaintiff to the defendants, and *consigned* to the defendants to be sold, from the expiration of the credits, in the case of notes and goods sold; and in the case of goods *consigned*, from the time when the proceeds ought to have been remitted: whereas, the defendants ought not to be charged with any greater interest in the case of *consignments*, where the contract was made here, than is allowed by the law of this state.

5. Because, the defendants are charged with so much of the goods in the pleadings mentioned, and shipped by

1818.

CONSEQUA
v.
FANNING.

1818.

CONSEQUA
v.
FANNING.

the plaintiff to the defendants, on the 25th of *November*, 1810, on board the ship *Chinese*, as would amount to 21,798 dollars and 78 cents, invoice price, being part of the invoice of 64,818 dollars and 65 cents, whereof 43,025 dollars and 87 cents, appeared to have been assigned to *Baring & Co.*; which is erroneous, because no part of the said cargo was specifically assigned to *Baring & Co.*; but another and different shipment made by the plaintiff to the defendants, in a former voyage of the ship *Chinese*; and the shipment to *Baring & Co.* was in 1809, the amount of the invoice of which was the sums last mentioned, and which shipment is not stated in the plaintiff's bill; but the facts are set forth at large in the answer.

6. Because the defendants are directed to account for the proceeds of the said invoice of 64,828 dollars, and 25 cents, deducting only 43,025 dollars and 87 cents, part thereof; whereas, the defendants are bound to account to *Baring & Co.*, or their representatives, for the full sum of 43,025 dollars and 87 cents, whether the invoice would amount to that sum or not; and the defendants are sued in the circuit court of the *United States*; and there is reason to apprehend that they will be compelled to account for the full sum, provided there should be a balance in their hands to that amount due to the plaintiff, including the invoice assigned.

*September* 29th and 30th.

A re-hearing having been granted, the cause was argued by *Riggs* for the plaintiff, and *T. A. Emmet* and *Brackett*, for the defendants.

On a rehearing, the cause is open to the party who petitions for the rehearing, only as to those parts of the decree complained of in the petition; but as to the other party, it is open as to the whole matter.

THE CHANCELLOR. There is considerable variation in the objections made to the decree, as stated in the petition for a re-hearing, and in the points on which the cause was re-argued. But, I apprehend the rule to be well settled.

that upon a rehearing, the cause, with respect to the party who petitions to rehear, is open only as to those parts of it complained of in the petition; though as to the other party, it is open as to the whole matter of the decree. The rule was so declared by Lord Chancellor *Cowper*, in *Rawlins* v. *Powel*, (1 *P. Wms.* 300.) and it is to be met with in all the subsequent treatises on the subject.

I shall, therefore, take up the objections, as they were stated in the petition on which the rehearing was granted.

1. The first objection is, that the decree did not order a general account to be taken and stated between the parties, and that the decree was confined to the specific charges stated in the bill. The second objection was an amplification of the first, and applied to that part of the decree which directed all proper allowances to be made to the defendants for remittances and payments, without allowing them to go at large into all and every matter of account. The defendants now seek, upon the rehearing, for a general account of all transactions between the parties, from the first day of *January*, 1805, to the filing of the bill.

It is a little singular, that this objection should not have been made before the cause went to the Master. A whole year elapsed between the time of pronouncing the decree and the coming in of the Master's report, taken upon the foot of the decree. It seems not to have been discovered, that such a general account was wanting, until after a large balance had been found, and stated against the defendants. But the point is now open for re-consideration, and it will be requisite to examine the pleadings closely, to see what are really the matters in issue. I take it for granted, that the order for a reference must be founded upon the pleadings and proofs, and that it cannot be made more extensive than the *allegata* and the *probata* of the parties.

The bill is founded upon specific charges. There are none of an earlier date than *December*, 1807. There are

*An order of reference for an account before a Master, must be founded on the pleadings and proofs, and cannot be made more extensive than the allegations and proofs of the parties.*

1818

CONSEQUA
v.
FANNING.

CONSEQUA
v.
FANNING.

Where the
charges in the
bill are specific,
setting forth
*items* of the ac-
count with the
dates, on an or-
der of refer-
ence, for an ac-
count, the in-
quiry is not o-
pen beyond the
special matters
charged; tho'
the bill may
contain a gene-
ral charge at
the conclusion;
and a prayer
"for a full ac-
count concern-
ing the premi-
ses."

various *items* distinctly set forth, and though the bill, near'
the conclusion, charges, that the defendants were indebted
in various other large sums of money for goods sold and
delivered, and for goods consigned for sale, yet this ge-
neral charge seems to have been thrown in for greater
caution, and intended only to cover any mistakes and
omissions in the particular specification. This is evident-
ly the good sense and logic of the pleading, and the prayer,
that the defendants should come to a full account "con-
cerning the premises," must be applied to the charges in
detail, and to which only the defendants were called upon
to answer.

Neither the answer, nor the proofs, will warrant an in-
quiry, beyond the special matters charged in the bill.

The defendants, after denying all general copartnership,
and all joint concern, other than "in the shipment, impor-
tation, and sale on commission, of cargoes of merchandise,"
state, that the plaintiff "had been given to understand
that the defendants were willing, on their joint account, to
receive teas and other goods to sell on commission for the
plaintiff," and that, "with a view to such sales on com-
mission for account of the plaintiff, an agreement was
made and entered into by one of the defendants, on their
behalf, with the plaintiff." The agreement here referred
to, is stated in the answer, to have been made in *October*,
1807. This is very decisive proof that the defendants do
not entitle themselves by their answer, to go farther back
than the date of the specific charges in the bill; and any
attempt to go farther would only be to involve the charges
in question in a labyrinth, from which nothing could arise
but embarrassment and delay. And, indeed, in another
part of the answer, after meeting all the charges in the
bill, they expressly deny "that they are indebted to the
plaintiff, between *December*, 1805, and the filing of the
bill, otherwise than is above stated, for any goods sold or
consigned to them.

After giving a very particular answer to every particular charge, the defendants give a detail of their counter claims against the plaintiff, and it is to be seen how far they are embraced by the decree.

In the first place, they claim commission on disbursements on the teas sold, on account of the plaintiff, and shipped on board the vessels mentioned in the bill, and they also claim for duties guaranteed and paid on the teas consigned to them, and for freight of teas shipped in the ship *Chinese*, on her second voyage, and the premium for insurance thereon, and for freight of teas shipped on board the *Hope*, in 1810, and for a further charge of freight of the cargo by the *Hope*, and for charges of remitting 30,000 dollars in specie. I should apprehend that these charges were all reached by the decree, which could only have intended to make the defendants answerable for the *net proceeds* of the cargoes consigned to them, after making them all just allowances. The petition for a re-hearing does not state, nor has it been shown or pretended, that any of those charges were not received, as competent subjects for examination, under the decree. I presume, they do not form any part of the ground of complaint; nor have the defendants specified the particular charges which have been rejected by the Master, nor in what they consisted. They deal in general terms in their objection, and say only, that " matters of account to a large amount" are excluded. We ought, at least, to have been so far informed of what those matters of account consisted, as to have been enabled to form some judgment of their pertinency or application to the subject matter of the suit. It would be an act of great indiscretion, if not of positive injustice, to interfere with a decree upon such a loose and general allegation.

There are other counter claims set up in the answer, which seem to be utterly groundless, even if the decree was to embrace them.

1. The defendants claim a sum for the difference between ten per cent. per annum, under the agreement which they set up, and the legal interest of this country, on certain notes, the amount of which they were prevented from remitting for one year, by reason of the embargo. The solid objection to this claim is to be found in the principle declared in *Conway* v. *Gray*, (10 *East*, 536.) that *in all questions arising between the subjects of different states, each is a party to the public authoritative acts of his own government, and he is as much incapacitated from making the consequences of an act of his own state, the foundation of a claim to indemnity upon a foreign subject, as he would be, if such act had been done immediately and individually by himself.—* Lord *Ellenborough* said, that this same principle was established in *Touteng* v. *Hubbard*; (3 *B. & Puller*, 291.) and, indeed, we find the principle declared in every period of the *English* law, that every subject is to be deemed a party to the laws of his own government. (*Bro. Abr.* tit. *Parliament*, pl. 41. *Dyer*, 23. *b.* pl. 148. 9 *Co.* 107. *a.* Lord *Mansfield*, in *Wadham* v. *Marlowe*, cited in 8 *East*, 314, note.) The force of this doctrine must be specially felt and acknowledged in this country, where the acts of the government are practically, as well as theoretically, the acts of the representatives of the people.

2. The defendants further claim, in their answer, the heavy sum of 17,085 dollars and 94 cents, for overcharges on teas and nankeens shipped to them in 1809 and 1810, and which sum was over and above what equal qualities of the same articles could have been furnished for, at the time they were shipped. If the goods, in this case, were consigned to the defendants to sell on commission, they had no right to complain of the charge, for it was no injury to them, and the plaintiff was in the exercise of his perfect right. If the goods were sold and delivered to the defendants, why did they accept of them? Why did their agent at *Canton*, accept of them, in the first instance? The

*In all questions arising between the subjects of different states, each is to be deemed a party to the laws and authoritative acts of his own government.*

*If a merchant abroad send goods to a merchant here, by his order, or that of his agent, which are received with the invoice, and accepted without objection at the time, the merchant here cannot, afterwards, object, that the articles were overcharged in price.*

invoice always accompanied the shipment and delivery of the cargo, and they affirmed the charge, by the acceptance of the goods. The date of the charge, according to the schedule annexed to the answer, is in *August*, 1812. The pretension is groundless, in every view; the charge is too loose and at too late a period to be deserving of credit. It does not even appear, whether the goods were shipped on sale or on consignment, nor is there any specification of particulars, as a particle of proof to give colour to the suggestion.

3. Another charge is, that the defendants paid one *David Bentock* the difference of value of 900 pieces of nankeen, shipped to them as for long nankeens, and sold as such, and which turned out to be pieces of the short kind. The charge is of the date of *June*, 1811, and there is no proof, either of the defect or of the payment.

4. The defendants further charge near 4,000 dollars for the difference of interest, between 10 and 12 per cent., exacted from their agents, *Crary* and *Nexsen*, on sundry promissory notes paid by them to the plaintiff; and they rely upon an agreement, stated to have been made by *Edward Fanning*, on behalf of the defendants with the plaintiff, in *October*, 1807, by which 10 per cent. interest only, was to be charged.

The only agreement proved, is one of the 8th of *November*, 1807, made between the plaintiff and *Edward Fanning*, one of the defendants. It differs materially from the one set forth in the answer, and there is no evidence in the case, that *Fanning* was authorized to make such an agreement on behalf of the defendants. We have seen that the defendants, in their answer, deny any copartnership between themselves, except for the single purpose of *the shipment, importation, and sale on commission, of cargoes.* One of the copartners, for such a special purpose, had no authority to bind the rest to such an agreement as this, which was clearly not within the scope and purview of the

1818.

CONSEQUA
v.
FANNING.

partnership. Nor does it appear, that the agreement, as proved, was ever acted upon by the parties. It related to a ship, "to be built at *New-York*, of 350 or 400 tons burthen, for the *Chinese* trade," and the plaintiff was to furnish one third of the cargo, and the defendants goods for the residue. The defendants were to have goods to the amount of 12,000 dollars, consigned to them to sell, and they were to retain the net proceeds, free of interest, as long as the ship should continue in the *China* trade, and they were to carry the plaintiff's cargo free of freight.

None of these provisions were ever carried into effect; no ship was ever built and put into the *Chinese* trade, on the foot of this agreement. The plaintiff was, also, to do the business of the ship at *Canton*, without charging any commission, and the defendants were to sell the cargoes of the ship at *New-York*, free of commission. The charges, in the answer, of freight and commissions, are directly repugnant to these provisions, and afford the most satisfactory proof that the agreement was never observed or regarded as binding.

The defendants admit, that the lawful and customary rates of interest at *Canton*, is 12 per cent.; and all pretence of a claim to be charged a lower rate of interest, on the ground of this agreement, is clearly without foundation.

Where a consignee of goods sells some of them on credit, and settles with the consignor, and pays him the full amount; he cannot, afterwards, claim to be reimbursed, for any part, on the ground of a bad debt, made in the sale, there being no fraud or mistake in the settlement.

5. A further charge in the answer, is, for the plaintiff's proportion of bad debts made by the defendants, on the sale of teas on their joint account, to the amount of 2,060 dollars and 71 cents. But the answer admits, that the plaintiff had charged, and had "received payment from them of that sum;" this act certainly closed the inquiry, and the defendants must be considered as assuming those debts to themselves. There would be no end in dealings, or safety to persons, if a charge of this kind was to be indulged, after the debt itself had been assumed and paid, and when no fraud, or mistake, is suggested. It

is easy to perceive how very precarious the admission of such a principle would leave the concerns of the foreign creditor in a distant region of the globe, who has no means of knowing the debtors, or of guarding against imposition. The same observations apply to another charge for a bad debt on a sale of tea, received by the *Chinese* on her second voyage, and sold to *J. D. Miller.* The cargo was shipped in *November,* 1810, and this charge is of the date of *March,* 1813, and the defendants admit in their answer, that they "paid and settled with the plaintiff for this debt," and, therefore, the claim is to be "reimbursed."

6. The defendants advance another charge of 6,583 dollars and 56 cents, being the difference of market price of certain seal and other skins, shipped by the defendants and consigned to the plaintiff, and received by him from their supercargo, in *March,* 1807, and for which, they say, the plaintiff "was to allow as good a price in cash as any merchant in *Canton* would give, and that the plaintiff did not allow or account with them but for a very inferior price." This cargo was delivered in 1807, and the charge bears date as late as 1812, and admits, that the parties had accounted together for the skins. To open this inquiry, after the lapse of so many years from the delivery, and after the settlement which the very terms of the charge imply, would be very unusual, and hazardous to the cause of justice. There has not been a particle of proof in support of the charge, and it bears a portion of hardihood in its very features.

7. Another charge in the answer, is of the sum of 14,639 dollars and 94 cents, for interest due from the plaintiff, on sundry large sums or balances in his hands, due and unpaid by the plaintiff, from 1806 to 1812. This is a most extraordinary, as well as a most extravagant *item.* Unsettled accounts do not bear interest, as of course, until liquidation. The charge assumes, that the balances were paid in 1812. No interest subsequent to that period is claim-

1818.

CONSEQUA
v.
FANNING.

Where a balance of an account is paid, without a charge of interest, it cannot be made afterwards.

ed. Why was the principal received without interest, if the latter was due? Was there ever an account unravelled for such a purpose, after the balance had been received? There has been no explanation offered; and when would accounts be closed, and litigations cease, if such inquiries are to be permitted? The receipt of the balance is good proof that no interest was due by the course of the dealing, or that it was received, or was waived; and such a presumption must stand good, until put down by contrary proof, of which there is none.

8. The defendants further charge the sum of 12,877 dollars and 51 cents, for freight of the cargo on board the ship *Chinese*, from *Canton* to *New-York*, being the plaintiff's first consignment, together with the further sum of 2,366 dollars and 43 cents, for the premium of insurance and commissions respecting that cargo. There is no charge in the bill respecting this cargo, which was the one assigned to *Baring & Co.*, and for which the defendants admit in their petition for a rehearing, that "they are bound to account to *Baring & Co.*, or their representatives, for the full amount." They are bound to account only for the net proceeds, and, consequently, these charges for freight, and insurance and commissions, are to be deducted from those proceeds, and these *items* are to be settled with *Baring & Co.*, and not with the plaintiff. Nothing can be plainer than this course, and nothing more unreasonable than to make these charges against the plaintiff, after the admission, and the proof that he is not the owner of the cargo, nor of the proceeds.

9. The next charge is 144 dollars and 51 cents, for teas which proved to be of a bad quality, and which the defendants had sold for the plaintiff, and which sum "they were obliged to refund by reason thereof." This charge bears date as late as *April*, 1813, long after all the shipments in question, and we have no explanation of the case, nor upon what grounds the defendants were obliged to re-

fund that sum, or to whom, or by what authority, or how
the sale was conducted, or what assurances, or what sam-
ple was then afforded.  The charge is equally suspicious,
and unsupported.

10. The defendants, in addition to all these unfounded
charges, state, that the plaintiff purchased of them, in 1807,
2,200 *piccols* of sandal wood, amounting to 52,800 dollars,
and "debited to the plaintiff, and for which he ought pay, or
account to them."  The proof that appears to bear upon
this charge, is a certificate signed by the plaintiff, and the
defendant, *Edward Fanning*, dated the 8th of *October*,
1807, stating, that the latter had sold to the former a cargo
of sandal wood, laden on board the *Hope*, at the *Fegee*
islands, and soon expected to be delivered, and to be
"payable in cash."  It would be a little extraordinary, if
such a cargo, declared to be payable in cash as early as
1807, should have been delivered, and the payment de-
ferred to this day.  The charge does not appear to be an-
nounced, at the end of the answer, with the confidence be-
longing to truth ; and after all the various dealings and pay-
ments made by the defendants, and confessed in the an-
swer, I entertain an entire conviction that this charge is
unfounded.  The answer does not say, that the cargo was
not paid for, but only that the plaintiff ought to pay, or ac-
count to them.  The testimony of *Obed Chase*, relates to
a subsequent sale of sandal wood to the plaintiff, in *No-
vember*, 1810; he was also at *Canton*, in 1807, when
the ship arrived from the *Fegee* islands, and he resided at
the same house with *Fanning*, for fifty days, and they had
frequent conversations together, and not a syllable of tes-
timony is given of any complaint by *Fanning* of non-pay-
ment.  He makes no mention of any such difficulty, nor
do we hear a complaint, or a word as to the non-payment
for the sandal wood, in 1807, until we meet with the charge
thrown in as a make weight, at the end of the answer of
the defendants in this cause.  The sum was of too great

consequence to have been forgotten, even in the *India* trade. If that cargo had really never been paid for, it is sufficient to say, that it was a debt due to *Fanning*, and not to the defendants, for they have expressly renounced in their answer, all copartnership concerns, except in the limited terms which have been mentioned.

There are two other specific charges in the answer which remain to be disposed of.

One of them is demurrage of the ship *Hope*, detained by the plaintiff, and this charge rests upon the testimony of Captain *Chase*. He says, that when he arrived at *Canton*, in *November*, 1810, with a cargo of sandal wood, he was detained from the 20th of *December* to the beginning of *January* following, in consequence of a dispute between him and *Consequa*, as to the price, arising from the quality of the wood. It seems, that *Chase* judged it expedient, or necessary, at last, to comply with the terms of the plaintiff, and the time consumed in that dispute the defendants charge as demurrage. Such a charge is without precedent. Demurrage means a delay, at the instance of a merchant, for farther time to load or unload, or to sail with convoy, and for which he covenants to pay a daily sum. The ship *Hope* was not detained at the instance, or for the benefit of the plaintiff. The delay was the consequence of a dispute between the parties, as to the price of an article, and may have arisen as much from the obstinacy or unreasonableness of *Chase* as of *Consequa.*— The merit of that dispute is not now the point of inquiry. It is certain that the charge, as it stands, is without the shadow of foundation; nor does the charge and the proof correspond, in any degree. The detention spoken of by *Chase*, was in 1810, and he says it did not exceed 25 days, and he should suppose 45 dollars a day to be a reasonable demurrage for the *Hope*. The charge (see account, No. 1.) is of the date of *August*, 1812, and is as

follows : "Demurrage on ship *Hope*, 44 days, at 150 dollars—6,600 dollars." It would really seem as if a number of these groundless charges had been fabricated, after all the business of the parties had terminated, for the mere purpose of imposition.

The other charge is for " costs, freight, and expenses, of a cow sent to the plaintiff." The receipt of this cow is admitted in a letter of the plaintiff, of the 30th of *November*, 1810, (being all the proof which we have upon the subject,) in which he says, "I thank you very much for your attention in sending me so handsome a cow and calf." Considering the terms of this acknowledgment, the trifling value of the article, and the extensive business in which the parties were engaged, I should infer, that this cow was intended, and received, as a gift, and that the defendants had, afterwards, most ungraciously turned it into a charge. It appears, from their account, No. 1., that the date of the charge of the cow, is the 31st of *December*, 1812, and is in these words : " cost freight and expenses, of a cow sent per *Chinese, May*, 1810, 250 dollars."— Here was an interval of above two years and a half, between the shipment of the cow and this extravagant charge ; and the letter of the plaintiff, to which I have referred, contains another and a more explicit act of kindness between the parties, and gives additional force to the construction which I have drawn. The plaintiff, on behalf of his son, acknowledges a " very handsome comeshaw," from the son of *Edward Fanning ;* and he courteously meets the civility, by sending " some little comeshaw," in return, and declaring that he should be " very happy to see Mr. *Fanning* in *Canton*." Without some farther proof, I should never consent to the charge in question, considering all the circumstances under which it is presented.

I have thus gone through a laborious examination of all the charges which the defendants have specified in their

answer, and such of them as are tenable, are shown to be embraced by the terms of the decree. It is not stated, or alleged, that any of the charges which are considered to be admissible subjects of inquiry, were excluded before the Master; nor do the defendants show, or specify, the charges which they wish to establish. We have a right to presume that those were deemed the most material and best founded charges, which are minutely detailed in the answer, and which we have had under review. Can it, then, be fit or discreet, or would it be reasonable or just, after the samples which the defendants have given us, that a general account should be decreed of all matters and claims whatsoever, without any explanation of what they consist, or how they arose, or upon what testimony they rest? It would be to delay, or defeat justice, by a fruitless and vexatious inquiry.

While in this stage of the cause, I may notice, once for all, the charges which have been made, and the philippic pronounced at this re-hearing, as well as upon the former argument, against the tyranny and oppression of *Consequa*, and the other *Hong* merchants, at *Canton*. What was said by Captain *Chase*, (which I shall notice more particularly hereafter,) affords the only, but very insufficient, colour for the accusation. Judging from the pleadings and proofs in this cause, I should be led to conclude, that the plaintiff was a man " more sinned against than sinning." No general charges, unsupported by specific and pertinent testimony, can have any influence in the case. It may be, that the *Chinese*, considered in respect to their general manners and morals, are, as I incline to think they are, mean and semi-barbarous; but I have no doubt that there are numerous individuals among them, who are kind, beneficent, and just. If I am not mistaken, instances of such characters are mentioned by *Bell* and *Barrow*, in their accounts of the two most interesting embassies that ever went from *Europe* to *China*. We may

as well suppose *Consequa* to be of this class as of any other. His letters which have been read, so far from affording ground for crimination, may rather be cited as proofs of a frank and manly character. We have seen, in the case of his son, that he evidently cherishes tender feelings. He says, indeed, in his letter of the 21st of *October*, 1809, that he had charged compound interest on all notes due for above a twelve month. This is nothing more than the practice of all those merchants who make annual rests in their accounts; and we have the authority of very high names to say, that there is nothing intrinsically unjust in such a charge. It is no wonder that the plaintiff should think so seriously of the failure to pay interest, since the non-payment of interest subjects the debtor, by the *Chinese* laws, to corporal punishment. (*Staunton's Ta Tsing Lew Lee*, s. 149.) He, also, in that letter, admits, that he insisted on twelve, instead of ten, per cent.; yet the answer of the defendants acknowledges that twelve per cent. is the lawful and customary interest of his country. He admits, also, that the agents of the defendants used every exertion and argument to induce him to receive ten per cent., but he tells them, "I refused, and would have done the same, had either, or all of you, gentlemen, been present, and made the settlement yourselves."

When such a man, from such a people, comes, as a suitor into our courts, he ought not to be heard with a mist of prejudice hanging over his name, his character, and his country. His claims should be received with candour, and treated with impartiality. It is no more than common justice; but the sense of our responsibility cannot fail to be more lively, when we recollect that the people to whom he appeals, are in possession of gifts denied to the *Chinese*; I mean the blessings of freedom, and the light of science, and the still brighter light of the christian revelation.

2. The next objection to the decree is, that the defendants are charged with *Chase's* note for 35,711 dollars and 50 cents, or with goods sold and delivered to that amount, whereas they are not chargeable with that sum in either shape, and ought only to be charged with the same, as for goods *consigned* to them, to be sold for the account of the plaintiff, and that, in that way, they are willing to account.

The bill charges, that *Chase* gave the notes as the authorized agent of the defendants, for goods sold and delivered to the defendants. The answer admits the note, but denies that *Chase* was the agent of the defendants for that purpose. The defendants farther admit, that the goods, for which *Chase's* note was given, " were delivered by the plaintiff to them, and were intended by the plaintiff as a sale to them;" but they say, that upon the arrival of the *Hope* with that cargo, and before unloading, they entered a protest against receiving the goods on their own account, but that they should receive and dispose of them on account of the plaintiff. The only objection here to the decree is, that the defendants are charged with the cargo as sold, whereas they are willing to account for it, as consigned to them. The goods are delivered by the plaintiff to them as a sale, and the plaintiff intends the delivery to be a sale. All this is admitted, and the defendants take them under a protest, that they receive the goods as a consignment, and not as a sale. The defendants have not proved this protest; and if they had, it would be about as valid and efficacious, as a mental reservation to an oath. Of what use was this protest to the plaintiff, who resided on the other side of the globe? The acceptance and delivery are correlative acts, and if the plaintiff delivers for one purpose, as he did in this instance to *Chase*, for the defendants, and the defendants accept, they accept for that purpose, and cannot take for any other. A different construction would banish all sincerity and probity in dealing. It would enable a party

to take the goods, and set up a consignment or a sale as the cargo happened to come to a falling or rising market. Such a principle would be equally a reproach to the court who adopted, and to the party who applied it. Indeed, the answer of the defendants evidently considered this defence as feeble, for they provide a set-off, in case they are liable to pay the amount of the note, and specially insist upon the agreement of *Fanning*, in 1807, for ten per cent., in opposition to the terms of the note, which are twelve per cent.

The answer says, that the cargo of the *Hope*, in this case, was put on board, at *Canton*, by the plaintiff, without the consent of *Chase*, further than the net proceeds of the outward cargo. How far the cargo so put on board exceeded, or whether it exceeded, at all, the proceeds of the outward cargo, is not stated, or averred. There is no precise evidence of any *gravamen*, even upon the ground taken by the defendants. There is something, however, very improbable, and contrary to the most obvious dictates of common sense, in the charge, that the plaintiff forced any part of the cargo on board of the *Hope*, without, or against the consent of the captain. Would any reasonable man part with his own property, in this violent way, against the consent of the purchaser, and trust his goods in this country, without any security but a note extorted from Captain *Chase?* All the transactions of *Consequa* show more *method in his madness.* The whole accusation is absurd and incredible. If he did do this preposterous thing, how came the defendants so quietly to receive the goods? Their very acceptance of the goods in this country, denies, or waives the violence of the shipment at *Canton*. But the testimony of Captain *Chase* does not warrant the accusation. He does not pretend that the cargo which he received was a coerced delivery to him. All that he complains of is the dispute between him and the plaintiff, as to the price of the sandal wood.

and that he did, "as it were from necessity," comply with the terms of the plaintiff, and give the note. Yet to show how very fallacious is his memory, he says, the note he gave was for about 20,000 dollars, payable in 18 months, whereas, it has been admitted to have been for 35,717 dollars and 50 cents, payable in 16 months.

But this point need not be pursued further, for the petition for a rehearing, admits that the defendants are responsible for the goods, to the amount of the note, as for a *consignment;* and if, instead of a consignment, the act ought to be deemed a sale, there is an end of the question.

3. Another ground for the rehearing is, that by the decree the defendants are charged, on notes, and goods sold and consigned, with interest, at the rate of 12 per cent, whereas, the defendants ought not to be charged, in the case of consignments, where the contract was made here, with any greater interest than the lawful interest of this state.

*Interest is payable according to the law of the country where the debt is contracted, and to be paid.*

*Where a Chinese merchant consigns goods to a merchant in New-York, for sale, which are delivered at Canton, to the agent of the New-York merchant, who neglects to remit the proceeds to the consignor, he is entitled to interest on the amount according to the law of China, being at 12 per cent.*

The answer to this objection is, that it is an acknowledged rule, that interest must be paid according to the law of the country where the debt was contracted, and to be paid, and not where it is sued for. The cases cited by the plaintiff's counsel show this. (See also, *Elkins v. East India Company,* 1 *P. Wms.* 395. and 2 *Fomb. Tr. of Eq.* 442. 446.) The principle is entirely applicable to the case of consignments. The plaintiff consigns a shipment to the defendants, and the cargo is received at *Canton* by the agent of the defendants, on their behalf. *Canton* is then the place where the contract is made, and *Canton* is the place where the debt is to be paid. The defendants admit, in all the cases of cargoes consigned to them, that they were to receive and remit the proceeds, and the interest for which they are chargeable, is upon the sum which ought to have been remitted, and to be computed from the default. There is no difference, in principle, as to this point, between a sale and a consign-

ment. The contract is equally made, and the debt equally to be paid in *China*, in the one case as in the other; and if we should deny to the *Chinese* merchant his own legal rate of interest on such contracts, we should be doing him an injustice which he would not meet with from the commercial part of *Europe*. To refuse to enforce such foreign contracts, as to interest, say the *English* books, would put a stop to all foreign trade.

4. The two remaining objections to the decree, relate to the allowance made in favour of the claim of *Baring & Co.*, and, it is contended, that there was an error in the decree, in supposing part of the 64,828 dollars and 65 cents, being the second cargo of the ship *Chinese*, was ever assigned to *Baring & Co.*, and that, notwithstanding that error, a sufficient allowance out of the cargo was not made for that claim.

This objection is not very intelligible; but the counsel for the plaintiff concede, that there is a mistake in the decree, in supposing that the assignment to *Baring & Co.* was out of the second shipment in the ship *Chinese*, in 1810, whereas, it was out of the first shipment in 1809, and it was the admission of the counsel himself which led me into this error. The mistake in the decree ought to be corrected in favour of the plaintiff, and not of the defendants. The charge in the bill, is for the cargo shipped on board the *Chinese*, in *November*, 1810, and consigned to, and received by the defendants. The answer admits the consignment and delivery, and it sets up the assignment to *Baring & Co.*, of the cargo shipped on board the *Chinese* on a prior voyage in 1809, and which cargo is not in question in this suit. Instead, then, of making the deduction out of the cargo shipped in 1810, to satisfy the assignment, there ought to have been no deduction, and the defendants should have been ordered to account for the whole of that last cargo. There were two shipments by the ship *Chinese*. The one in 1809, amounted to

**1818.**

**LE**
**v.**
**LANSING.**

43,025 dollars and 87 cents, the precise amount of cargo assigned by the plaintiff to *Baring & Co.* . The other in 1810, amounted to 64,825 dollars and 65 cents, and this is the one of which the plaintiff seeks an account. In consequence of a mistake, the decree gives the plaintiff only one third part, instead of the whole cargo consigned to the defendants, in 1810. The defendants ought to account for the 64,825 dollars and 87 cents, and not merely for the 21,798 dollars and 78 cents. In this respect, the decree ought to be corrected, but in all other respects, it must remain as it is, and none of the objections taken to it, in the petition for a rehearing, are well founded.

Decree accordingly.