## Case No. 7,256.

### JELISON v. LEE et al.

[3 Woodb. & M. 368; 19 Hunt, Mer. Mag. 78.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1847.

Andrew & Parsons, for libelant.
Mr. Bolles, for libelees.

WOODBURY, Circuit Justice. The decree below in this case is objected to on several grounds, which are entitled to a separate

[1] [Reported by Charles L. Woodbury, Esq., and George Minot. Esq. 19 Hunt. Mer. Mag. 78, contains only a condensed report.]

consideration, and some to a detailed one, from the importance of them to the commercial community at large. In the argument of these questions, the counsel for the libelees claimed the right to begin and close, on the ground that they set up exceptions to the claim, which they must sustain like a special plea. But adverting to the circumstance that the libelant brings the suit and makes averments and claims first, which the libelees merely contend are too broad, and do not admit what is claimed, I see nothing to alter the right of the libelant to begin and close. But while this may be considered a right of some importance before juries who take few or no written minutes of evidence, it can be of little consequence before a court, and hardly worth the corresponding burthen it imposes of turning the scales in its favor in cases of doubt.

The principal stipulations in the charter party were these: The owner engaged "that the whole of the said vessel, with the exception of the cabin and the necessary room for the accommodation of the crew and the stowage of the sails, cables and provisions, shall be at the sole use and disposal" of the hirer, and "shall receive on board a full cargo of cattle bones to be broken and stowed in the customary manner," "the charter (money) to be paid on the discharge of the cargo at Hull"—$3000.

The first leading objection here is, that all the proper space in the vessel was not allowed so as to entitle the libelant to claim that he earned full freight. Undoubtedly when examined by some of the witnesses, such was the appearance of the vessel. But others, who had good means of knowing the truth, testify positively that the bulk-head was so removed as to leave as much more space than is usual to be occupied by the cargo, as was put elsewhere than on deck, and not in parts of the vessel reserved to be occupied by wood or water. It is not pretended that the owners of the ship or the master wanted any room for any cargo of their own, or any accommodation of the officers personally, or to prevent the vessel being in greater danger by drawing too much, if fully loaded. There was then no selfish motive to injure the hirer of the vessel in this way, and if humanity to the crew, to secure for them below wood and water after a violent storm, was a motive for placing more of those below than ordinary, the captain seems to have been cautious not to do this to the injury of the freighters, but by removing the bulk-head closer, he did it to the injury or inconvenience of those to be benefited, the officers and crew. Such providence and attention to the safety of life, as well as property, are to be encouraged where practicable, and when not exceeding the limits of prudence and the laws. See Weston v. Minot (at this term) [Case No. 17.453].

Having earned full freight, the next question is, whether the owner of the vessel was not entitled to receive it without any reduction for commissions on it by Ward, the real debtor for it, as the owner of the cargo. All know that a debtor cannot be permitted to charge commission for paying over his own debt. Even a mortgagee cannot claim them on the rents of the estate, if he occupied himself, and did not collect them of others. 4 Kent, Comm. 166, note; 14 Pick. 98; 5 Pick. 146; 16 Pick. 46. The only pretence on principle for allowing him commission for paying over his own debt, is that the vessel was "addressed" to him. But this, so far from having been in truth done, in order to justify him in charging commissions on the freight in a case like this, was done avowedly to prevent it, and this, with the full knowledge and seeming acquiescence of his agents. Regarding the agent and the principal as one for this purpose, Jelison had the words changed in the charter from "consigned" to "addressed," by an arrangement with Ward himself, through Lee, with the express view of removing any foundation for a claim like this, to commissions in a case like the present. Looking to the claim as a question of principle, also, it has no service performed in this respect, no duty done, on which it can honestly rest. Commissions are properly paid for services and duties and risks, and not for nothing. When paid on freight to consignees or persons to whom vessels are addressed, it is for the service of collecting that freight from others, and the risk attending the keeping of the money of others till paid over. These services and risks exist in ordinary cases very strongly where the freighters are numerous, and for small quantities each, and to some extent where there is only one hirer of the vessel, but he a person to collect freight from by the consignee, and being a person other than the consignee himself.

The large mass of the testimony on both sides goes to sustain this view, and but for another consideration would dispose of this point entirely, because here Ward was to perform no service in collecting freight of any other person, nor run any risk in respect to money by counterfeit, or by keeping it after collected of others, till paid over to the captain or owner of the vessel. That other consideration is the position taken as to an usage existing, which sustains a charge of commissions on the freight, even where the vessel is addressed to the owner of the cargo. Some of the testimony would seem quite decisive to show that such a usage has grown up in parts of England, if not on the continent, within the last quarter of a century. But this is contradicted by other witnesses, though fewer in number. It is said by others still not to be a settled usage anywhere, but resisted and irregular, and others testify to its being unreasonable and extortionate wherever practiced.

My own opinion on the whole evidence is, that it is by no means proved in cases pre-

cisely like this, that an usage is tolerated to tax commissions. And next, if it was so proved, that it is a bad usage and not to be respected or upheld as reasonable. All usages to be sustained, must not only be proved, but be reasonable. Taylor v. Carpenter [Case No. 13,785]; Case of The Reindeer [Id. 11,679]. They must, also, be uniform and notorious, so as to be presumed to come within the views and intents of these parties to be conformed to when the contract was made. Smith, Merc. Law, 326; 1 Duer, Ins. 258; 2 Bos. & P. 168; Rogers v. Mechanics' Ins. Co., [Case No. 12,016]. Whereas, the facts are that they meant here to act independent of any such usage, if one existed. We have already assigned our reasons why such a usage is not just in a case like this, where neither service, risk nor duty is performed, to earn commissions. A debtor in all cases might as well charge commissions for paying his own debts. We see, likewise, in looking at the testimony, which seems to establish the existence of such a usage, that in no case is it stated in detail that the hirer of the vessel was the agent of the owner of the cargo, and the owner himself was to pay the freight due from himself or his agent. On the contrary, in most of the cases the debtor for the freight may not have been the owner of the cargo, even when he was the consignee, but the vendor of the cargo may have been bound to deliver it to him and to pay the freight. Then in such case it will be seen that the consignee may be owner of the cargo, and still the obligation to pay the freight belong to another person, and a duty and service and risk exist in the consignee, when collecting the freight from another and paying it over to the ship-owner as his captain. Nor does it answer, in cases like the present, to substitute for some service performed to earn commission, an argument, that if the vessel was consigned to another person, he would have a right to charge commissions, and hence it may as properly be consigned to the hirer himself, and let him charge them. As well might a lawyer charge commissions on collecting his own debt, claimed of him by his creditor, because if the creditor had left it to be collected with some other lawyer, commission must be paid to him. But there is another answer to this. The ship-owner, if consigning the vessel to another, might expressly exempt the collection of freight, when due only from a single person, and let his captain receive it from that person. So if he meant to let his captain act in this case, when the charter party was drawn up, then there would have been no necessity to employ and pay another for this service, and hence no ground exists to claim it here on the hypothesis that it would have been otherwise paid to some other person.

Believing, then, that the usage to charge commissions in a case like this in all material respects, not to be proved to exist, and if so proved, that it is not reasonable or uniform, or notorious, I think the captain was entitled to receive full freight, without deduction for those commissions, any more than for the supposed want of full room or stowage. It is somewhat remarkable that this same question in principle has arisen in political science, and been solved in a similar way by the strong mind of Hamilton. The inquiry was whether the United States, as a debtor for its funded stock, could properly impose a tax on its own debt. Though all property in a state is subject to taxation, as a general rule, yet this was a property only in promises, and there might likewise be expressed or implied a condition not to tax it, not to keep back, either by tax or commissions, the full amount promised. "To tax the funds (said he) is manifestly either to take or keep back a portion of the principal or interest stipulated to be paid. To do this, on whatever pretext, is not to do what is expressly promised,—it is not to pay that precise principal or that precise interest which has been engaged to be paid; it is, therefore, to violate the promise given to the lender." Report on Public Credit, 1795. He goes much further into reasoning in support of this conclusion, as may be seen in the report. But enough is cited to show that it is like this case, which is an attempted deduction by the principal debtor, whose agent made the promise to pay the full $3000, and whether it be in the form of commission, or a tax, both amount to a virtual violation of the promise to pay that precise sum.

It must be kept in mind throughout, in order to judge of the cause and parties properly, that this is not a cause of the Messrs. Lees, in their own right, and Ward, a stranger, but, on the contrary, that they are mere agents, acting in the charter and in this suit as Ward's agents. It is virtually his shipment—his charter party—his freight to be paid—his defence to the present suit—his unreasonable claims of commissions, and not theirs, and on him must and should, therefore, rest the consequences. Finally, the $3000 being liable to be paid without deduction, how should it have been valued? Certainly not at the old computation by act of congress in 1790, for the custom house, of $4.44 per pound, and which so embarrassingly still prevails in computing the rate of exchange between this country and England, and makes exchange appear in favor of England from nine to nine and a half per cent., when it is only at par. Nor even at the more modern and more correct standard of $4.86, introduced by act of congress in 1837, for the use of the custom house. Nor should it be in any specific kind of dollars and their value, such as Mexican or American, or Spanish "milled" dollars, instead of the old "pieces of eight," which were not milled, but rough on the edge and in octagon form, and often in use till the middle

of the last century. But it should, if not paid in current specie dollars, be liquidated with as many sovereigns, or a bill for as many pounds sterling as $3000 would then buy in Hull. Story, Confl. Law, §§ 281, 309.

The true general rule as to value, is the value at the place agreed for payment, no matter where or how to be remitted. Story, Confl. Law, § 311; 4 Johns. 124; 20 Johns. 102; 8 Pick. 260. The departures from this rule are rather apparent than real, being mostly on a different state of facts, and arise out of reviews under the doubt if payment was not due in places other than the place where the creditor lived. Smith v. Shaw [Case No. 13,107; Lanusse v. Barker], 3 Wheat. [16 U. S.] 101; 3 Johns. Ch. 587; 17 Johns. 511. The value then and there of the pound sterling in dollars has been ascertained by the auditor and the computation in the court below properly graduated on that. I am satisfied that such is the true rule in mercantile contracts, rather than any old or new standard adopted by congress for assessing the revenue or invoices made out in pounds sterling. Whether the payment was made, as it should have been, by giving so long a bill and without interest, may be questionable. But if the captain consented so to receive it, and there is no proof to the contrary, and even his protest does not object to that. I think the owners are now precluded from taking advantage of it.

If the present decree conforms to these views, as is believed to be the fact, judgment must be rendered affirming it with interest since. But if it does not conform to them substantially, let it be corrected, and judgment be entered on it in its amended form. When I say that the $3000 are to be paid as above stated, without deduction for want of room or commissions on the freight, it is not meant that all advances and disbursements by Ward for the vessel before the freight became due after the delivery of the whole cargo, are not to be allowed and the ordinary commissions of 2½ per cent. on them, and this, though the latter were not at the time particularly demanded by Ward. They may have been omitted because the other commissions amounted to so much, or by accident, but they seem fair and proper on a revision of the just rights of the parties. Nor do I think there is sufficient ground for the allowance of the sum to which commission on the freight amounts on another ground, and under another name, that this sum is no more than adequate compensation for the other services actually performed. This argument has not in the evidence sufficient facts to stand on. The services performed did not, as seems to be argued, fill up a whole fortnight's labor by either Ward or any of his clerks. It probably engrossed but a few hours in a few days during that period, and with the other collateral advantages from such a consign-

ment, and the direct commissions on actual disbursements, the owner of the cargo would be amply repaid for all he is shown actually to have done for the libelant or his captain.

We have been asked by the libelees to refuse cost in this case to the libelant, though entitled to more than he has received for the debt or freight. The reason assigned is that the libel demands the whole freight, when a part had been paid by Ward. But the expense or cost has not been increased on that account. Nor does it appear that credit was omitted to be stated in the libel for any sinister object, but by the oversight or haste of a young practitioner who pursued the forms in this respect of the common law, without intending to cause or actually causing thereby any injury to the libelees. It does not, therefore, seem to be a case for interfering with the general principle, giving cost to the prevailing party in admiralty, as well as in common law cases. See Leland v. The Medora [Case No. 8,237]. Let a decree be entered in conformity with these views.